**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Alejandro Castillo, et al., | No. CV-22-00798-PHX-DWL |
| Plaintiffs, | **ORDER** |
| v. | |
| Spencer's Air Conditioning & Appliance Incorporated, | |
| Defendant. | |

Pending before the Court is a motion for summary judgment filed by Defendant Spencer's Air Conditioning & Appliance Inc. ("Spencer's"). (Doc. 45.) For the following reasons, the motion is denied.

## BACKGROUND

On May 10, 2022, Plaintiffs Alejandro Castillo and Gary Humm filed this collective action under the Fair Labor Standards Act ("FLSA") against Spencer's and three other defendants: K.B. Wallworx Inc., doing business as K.B. Appliance ("KB Wallworx"); Kenneth Charles Bruning, the president and director of KB Wallworx; and Lori Ann Bruning, the secretary and director of KB Wallworx. (Doc. 1.) Plaintiffs sued "on behalf of themselves and as a collective action on behalf of all other similarly situated current and former delivery and installation employees[1] . . . working for KB [Wallworx] at any time

---

[1]      Plaintiffs refer to the installation workers as "installation employees" and Spencer's refers to them as "Independent Workers." Because both designations appear to imply a legal conclusion, the Court will instead use the neutral term "installation workers." For the same reason, the Court will use the term "intermediary company" to describe entities such as KB Wallworx, in lieu of the term "Independent Contractor" used by Spencer's.

during the last three years delivering and installing televisions, appliances and other items bought at Spencer's." (*Id.* ¶ 2.)  Plaintiffs allege that "KB Wallworx and Spencer's served as joint employers of Plaintiffs and the other installation [workers]." (*Id.* ¶ 4.)

The factual allegations in the complaint, which the Court simply summarizes here for context, are as follows.  Spencer's operates a chain of stores in Arizona selling televisions and various appliances. (*Id.* ¶ 35.)  Spencer's also advertises and sells delivery and installation services for its products. (*Id.* ¶ 36.)  Spencer's sets the cost and schedule for delivery and installation services and customers pay Spencer's directly for these services. (*Id.* ¶¶ 37-39.)  Spencer's website invites customers to "[l]et the experienced professionals at Spencer's TV & Appliance handle [their] delivery and installation needs" and informs customers that Spencer's "screen[s] all employees [for symptoms of illness] everyday prior to going on delivery." (*Id.* ¶¶ 40-41.)

Spencer's contracts with several companies to deliver and install its products, including KB Wallworx. (*Id.* ¶¶ 51-52.)  KB Wallworx "is in the business of 'Appliance Installation'" and receives a fee from Spencer's for providing delivery and installation services. (*Id.* ¶¶ 53-54.)

KB Wallworx hired Plaintiffs to work as installation workers. (*Id.* ¶¶ 57, 59.) "Plaintiffs and the other installation [workers] were compensated by being paid a set dollar amount for each day they worked plus a percentage of the amount paid for each TV or appliance the customer purchased at Spencer's stores" but "were not paid overtime wages despite consistently working over 40 hours each workweek." (*Id.* ¶¶ 61-62.)

KB Wallworx classified Plaintiffs and others as "independent contractors," but "Plaintiffs never negotiated, entered into, or signed an independent contractor agreement" and "did not negotiate the compensation or fees they received for their delivery and installation work." (*Id.* ¶¶ 58-60, 63-64.)  "Plaintiffs and the other installation [workers] are told when and where to start their workday" and "are required to wear KB Appliance shirts while working." (*Id.* ¶¶ 71-72.)  "Spencer's provides Plaintiffs and the other installation [workers] with the proprietary materials, installation kits, fittings, brackets,

hoses, etc. required to complete each installation." (*Id.* ¶ 74.)  Spencer's also required installation workers to download a cell phone application called "Package AI" that allowed Spencer's "to inform Plaintiff Castillo and other installation [workers] of the number of deliveries they had scheduled each workday" and "to track Plaintiff Castillo in real time and continuously monitor his location using the GPS capability built into his cell phone." (*Id.* ¶¶ 75, 79-80.)

On January 17, 2023, Plaintiffs, KB Wallworx, and the Brunings filed a notice of settlement.  (Doc. 36.)

On February 16, 2023, Plaintiffs filed a notice of dismissal (Doc. 38), pursuant to which KB Wallworx and the Brunings were dismissed (Doc. 40), leaving Spencer's as the sole remaining Defendant.

On May 23, 2023, Plaintiffs filed a motion for preliminary certification of a collective action.  (Doc. 41.)  That motion later became fully briefed.  (Docs. 44, 47.)

On June 16, 2023, Spencer's filed the pending motion for summary judgment. (Doc. 45.)  That motion is now fully briefed.  (Docs. 51, 52.)

On November 17, 2023, the Court granted Plaintiffs' preliminary certification motion.  (Doc. 53.)

On February 7, 2024, the Court issued a tentative ruling as to the summary judgment motion.  (Doc. 56.)

On February 12, 2024, the Court heard oral argument.  (Doc. 57.)

## DISCUSSION

I.   <u>Legal Standard</u>

"The court shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014).  The court "must view the evidence in the light most favorable

to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018). "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors*, 771 F.3d at 1125 (internal quotation marks omitted).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Id.* at 1102-03. But if the movant meets its initial responsibility, the burden then shifts to the nonmovant to produce evidence to support its claim or defense. *Id.* at 1103. The nonmovant must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and emphasis omitted); *see* Fed. R. Civ. P. 56(c)(1). There is no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted). At the same time, the evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254. Thus, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for

either the plaintiff or the defendant." *Id.* at 255.

II.     Joint Employers Under The FLSA

"The FLSA broadly defines the 'employer-employee relationships' subject to its reach." *Torres-Lopez v. May*, 111 F.3d 633, 638 (9th Cir. 1997) (cleaned up). "Employee," subject to a few narrow exceptions not relevant here, "means any individual employed by an employer." 29 U.S.C. § 203(e)(1). "The FLSA's definition of employee has been called the broadest definition that has ever been included in any one act." *Torres-Lopez*, 111 F.3d at 638 (internal quotation marks omitted). "'Employ' includes[2] to suffer or permit to work." 29 U.S.C. § 203(g). "'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ." *Id.* § 203(d). "The definition of 'employer' under the FLSA is not limited by the common law concept of 'employer,'[3] and is to be given an expansive interpretation in order to effectuate the FLSA's broad remedial purposes." *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1469 (9th Cir. 1983); *see also Walling v. Portland Terminal Co.*, 330 U.S. 148, 150-51 (1947) ("[I]n determining who are 'employees' under the [FLSA], common law [employee] categories or employer-employee classifications under other statutes are not of controlling significance. [The FLSA] contains its own definitions, comprehensive enough to require its application to many persons and working relationships, which prior to this Act, were not deemed to fall within an employer-employee category.") (citation omitted);

___

[2]      "[T]he definition is introduced with the verb 'includes' instead of 'means.' This word choice is significant because it makes clear that . . . the text [is] intended to be illustrative, not exhaustive." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 162 (2012) (construing a different provision of the FLSA).

[3]      Under traditional common law principles, "[t]he key factor to consider in analyzing whether an entity is an employer is the right to control and direct the activities of the person rendering service, or the manner and method in which the work is performed." *Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 682 (9th Cir. 2009); *see also id.* at 683 n.5 (distinguishing the FLSA definition of "employer" as "inapplicable" in the common law context); *Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 754 (9th Cir. 1979) ("Courts have adopted an expansive interpretation of the definitions of 'employer' and 'employee' under the FLSA, in order to effectuate the broad remedial purposes of the Act. The common law concepts of 'employee' and 'independent contractor' are not conclusive determinants of the FLSA's coverage."). Under the FLSA, "control is just one of multiple issues that determine whether a joint employment relationship exists." *Lopez v. PT Noodles Holdings Inc.*, 2021 WL 2576912, *3 (D. Ariz. 2021).

*Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992) (noting that the "striking breadth" of the FLSA's definition of "employ" "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles").

The Supreme Court has emphasized that "the determination of the [employment] relationship does not depend on . . . isolated factors but rather upon the circumstances of the whole activity." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947). "Employees" in the FLSA context are "those who *as a matter of economic reality* are dependent upon the business to which they render service." *Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 754 (9th Cir. 1979); *see also Goldberg v. Whitaker House Co-op., Inc.*, 366 U.S. 28, 33 (1961) ("[T]he 'economic reality' rather than 'technical concepts' is . . . the test of employment.").

"When more than one entity is an employer for purposes of the FLSA, the entities are termed 'joint employers.'" *Torres-Lopez*, 111 F.3d at 638. "All joint employers are individually responsible for compliance with the FLSA." *Bonnette*, 704 F.2d at 1469. In "circumstances in which a company has contracted for workers who are directly employed by an intermediary company," also known as "'vertical' joint employment," the "'economic reality' test for determining joint employment status" applies. *Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908, 917 (9th Cir. 2003). *See also Real*, 603 F.2d at 756 ("DSA contends that it cannot be deemed an employer of the appellants because the appellants' direct working relationship rests solely with Driscoll, who is an independent contractor neither controlling nor controlled by DSA. We do not think the record establishes Driscoll's alleged independent contractor status beyond question. In any event, the independent contractor status of one party (Driscoll) standing in the position of an employer of certain workers does not as a matter of law negate the possibility that the contractee (DSA) may be a joint employer of those workers under the FLSA. The test, as always, must focus on the economic realities of the total circumstances.") (citation omitted). The Department of Labor previously issued regulations that offered examples of

joint employment situations, including "[w]here one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee" or "[w]here the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer." *Bonnette*, 704 F.2d at 1469 (quoting former 29 C.F.R. § 791.2(b)).[4]   Because "a fundamental principle behind the joint employment doctrine" is "that a worker may be employed by more than one entity at the same time," "[t]he issue is not whether a worker is *more* dependent upon" one entity or another. *Torres-Lopez*, 111 F.3d at 641.   "Rather, the inquiry must focus on the economic reality of the particular relationship between the [worker] and the alleged joint employer." *Id.*

"A court should consider all those factors which are relevant to the particular situation in evaluating the economic reality of an alleged joint employment relationship under the FLSA." *Id.* at 639 (cleaned up).  The Ninth Circuit has considered various factors at different times.  *See, e.g.*, *E.E.O.C. v. Pac. Mar. Ass'n*, 351 F.3d 1270, 1275 (9th Cir. 2003) ("In determining joint employment, various factors have been suggested in the collective experience of the judiciary and governmental agencies.  It is a rather elaborate collection and we choose to set forth these lists here with the caveat that they have been suggested for specific fact situations, certain of which are not present or relevant here.").  Factors considered in the Ninth Circuit include the four *Bonnette* factors—"whether the

---

[4]      On January 16, 2020, the Department of Labor promulgated a final rule that "revised the standards for determining joint-employer liability under the Fair Labor Standards Act," but the "Southern District of New York vacated all the relevant parts of the regulation" and then "on July 30, 2021, the Department of Labor issued a final rule rescinding the regulation in full."  *Valle v. Ceres Env't Servs., Inc.*, 2022 WL 1667015, *4 (11th Cir. 2022); *see also* 29 C.F.R. § 791.3; *Rescission of Joint Employer Status Under the Fair Labor Standards Act Rule*, 86 FR 40939-01 (July 30, 2021); *New York v. Scalia*, 490 F. Supp. 3d 748, 757 (S.D.N.Y. 2020) ("For more than eighty years, the Department of Labor . . . has recognized that multiple employers may qualify as 'joint employers' under the Fair Labor Standards Act . . . [but e]arlier this year, the Department issued a final rule . . . that narrows the definition of joint employment under the FLSA. . . .  The Final Rule . . . conflicts with the FLSA because it ignores the statute's broad definitions.  And the Department failed to adequately justify its departure from its prior interpretations and to account for some of the Final Rule's important costs.  So the Final Rule is also arbitrary and capricious.").

alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records," *Bonnette*, 704 F.2d at 1470—as well as the eight *Torres-Lopez* factors:

1.   whether the work was a specialty job on the production line;

2.   whether responsibility under the contracts between a labor contractor and an employer pass from one labor contractor to another without material changes;

3.   whether the premises and equipment of the employer are used for the work;

4.   whether the employees had a business organization that could or did shift as a unit from one worksite to another;

5.   whether the work was piecework and not work that required initiative, judgment or foresight [or a special skill];

6.   whether the employee had an opportunity for profit or loss depending upon the alleged employee's managerial skill;

7.   whether there was permanence in the working relationship; and

8.   whether the service rendered is an integral part of the alleged employer's business.

*Torres-Lopez*, 111 F.3d at 640 (cleaned up).[5]

The economic reality test "is not a mechanical determination" and although certain factors may "provide a useful framework for analysis," they "are not etched in stone" and should "not be blindly applied." *Bonnette*, 704 F.2d at 1470. The factors are only useful to the extent they aid in determining whether the workers "*as a matter of economic reality are dependent upon the business to which they render service.*" *Real*, 603 F.2d at 754.

---

[5]     In *Torres-Lopez*, the Ninth Circuit considered whether an entity was a joint employer under the FLSA as well as under the Agricultural Worker Protection Act ("AWPA") and applied the same test for both inquiries, explaining that "[t]he term 'employ' has the same meaning under the AWPA as under the FLSA" and that "the regulations implementing the AWPA provide that joint employment under the FLSA is joint employment under the AWPA." 111 F.3d at 639 (cleaned up).

III.   The Parties' Arguments

Spencer's largely[6] focuses on the *Bonnette* factors and argues that consideration of those factors compels the conclusion that it is not the installation workers' joint employer. (Doc. 45 at 5-15.)  Spencer's also cites *Moreau v. Air France*, 356 F.3d 942 (9th Cir. 2004), and *Maddock v. KB Homes, Inc.*, 631 F. Supp. 2d 1226 (C.D. Cal. 2007), as cases providing support for its position (Doc. 45 at 7-8) and placed particular emphasis on those cases during oral argument.[7]

Plaintiffs' response notes that "[w]hen evaluating vertical joint employment, the factors outlined in both *Bonnette* and *Torres-Lopez* are considered."  (Doc. 51 at 7.) Plaintiffs argue that the *Bonnette* factors "weigh in favor of Spencer's being Plaintiffs' employer under the FLSA" (*id.* at 8-13) and that the *Torres-Lopez* factors do as well (*id.* at 13-17).  Plaintiffs' response concludes by asserting that "[w]hile the determination of whether an entity is a joint employer is a question of law, the underlying facts are greatly disputed," and that the *Bonnette* and *Torres-Lopez* factors "weigh[] heavily in favor of there being a joint employer relationship."  (*Id.* at 17.)

In reply, Spencer's asserts that there can be no "genuine issue of material fact" because "the determination of a 'joint employment' is a question of law for the Court with Plaintiffs bearing the burden of persuasion."  (Doc. 52 at 1, citation omitted.)  Spencer's also contends that "[t]he issue of whether a company is the joint employer of an installer employed by a subcontractor has been judicially discussed at length and determined dozens of times" and suggests that only one "outlier" case, *Perez v. Lantern Light Corporation*, 2015 WL 3451268 (W.D. Wash. 2015), has resolved that question in favor of the plaintiff. (Doc. 52 at 2-3.)  Spencer's then addresses Plaintiffs' arguments regarding the *Bonnette*

---

6      Spencer's notes that it "entered into a written Independent Contractor Agreement" with KB Wallworx and includes a lengthy block quote from that agreement.  (Doc. 45 at 3-4.)  However, Spencer's does not argue that the verbiage of the agreement is relevant to whether it is the installation workers' joint employer.  As noted in Plaintiffs' response (Doc. 51 at 1), "[e]conomic realities, not contractual labels, determine employment status for the remedial purposes of the FLSA."  *Real*, 603 F.2d at 755.

7      In light of Spencer's renewed emphasis on *Moreau* and *Maddock*, this order includes additional passages discussing those cases that did not appear in the tentative ruling issued before oral argument.

factors.  (*Id.* at 4-10.)  Finally, Spencer's does not dispute that the Court should also consider the *Torres-Lopez* factors but asserts that, "[d]ue to space limitations," it was unable to address all of those factors.  (*Id.* at 10.)[8]  Spencer's then addresses four of the eight *Torres-Lopez* factors in the last few paragraphs of its reply.  (*Id.* at 10-11.)

IV.    Questions Of Law And Fact

As a preliminary matter, Spencer's asserts that there can be no "genuine issue of material fact" because "the determination of a 'joint employment' is a question of law for the Court with Plaintiffs bearing the burden of persuasion."  (Doc. 52 at 1.)  As explained below, Spencer's is incorrect—although the determination of joint employment does, indeed, ultimately present a question of law, that determination involves the weighing of the *Bonnette* and *Torres-Lopez* factors, which must be established through evidence that may be factually disputed.  Thus, although it is sometimes appropriate to resolve the issue of joint employment at summary judgment, either because the evidence bearing on the *Bonnette* and *Torres-Lopez* factors is undisputed or because the factors that are factually undisputed cut so decisively in favor of one side that any factual disputes as to the remaining factors are immaterial, it is also sometimes necessary to hold an evidentiary hearing before resolving the ultimate legal question of joint employment.

With that said, the existing Supreme Court and Ninth Circuit precedents bearing on these distinctions are not always a model of clarity.  In *Rutherford*, the seminal Supreme Court case on employee-employer relationships under the FLSA, the Court summarized the facts and then determined whether an employee-employer relationship existed without discussing how the factual determinations had been made and whether there had been any factual disputes.[9]  *Rutherford*, 331 U.S. at 724-26.  The underlying Tenth Circuit decision (which the Supreme Court affirmed) did the same, *Walling v. Rutherford Food Corp.*, 156 F.2d 513, 514-16 (10th Cir. 1946), but the concurrence noted that the district judge had made detailed findings of fact, which could "not be set aside unless clearly erroneous"

---

8    Spencer's did not request an expansion of the page limitation for its reply brief.

9    The Court identified only one fact as "undisputed," 331 U.S. at 726, which implies that other facts may have been disputed.

under Rule 52 of the Federal Rules of Civil Procedure.  *Id.* at 517.  Although both the Tenth Circuit and the Supreme Court concluded that an employee-employer relationship existed—contrary to the conclusion reached by the district court—neither appellate court set aside any of the facts found by the district court.  Rather, they determined that the district court had reached the wrong legal conclusion, a point the Supreme Court later clarified:

> *Rutherford* should [not] be read to depart from the rule laid down in *Walling*.  . . . [In] *Rutherford* . . . this Court held that the District Court erroneously based its conclusion that particular employees were independent contractors on "isolated factors" in the employee's relationship with the employer.  We set forth a lengthy summary of the facts without indicating the source for such a summary; but a fair reading of the opinion indicates that we were focusing on a legal question, and not on the allocation of factfinding responsibilities between district courts and courts of appeals.  We therefore reaffirm our holding in *Walling* that the facts necessary to a proper determination of the legal question whether an exemption to the FLSA applies in a particular case should be reviewed by the courts of appeals pursuant to Rule 52(a), like the facts in other civil bench-tried litigation in federal courts.

*Icicle Seafoods, Inc. v. Worthington,* 475 U.S. 709, 712-13 (1986) (cleaned up).

In some appellate decisions following *Rutherford*, the procedural posture was opaque.  For example, in *Tobin v. La Duke*, 190 F.2d 677 (9th Cir. 1951), it is unclear whether the district court made findings of fact, but at any rate, the facts were not in dispute, as they had been "summarized in a stipulation of the parties, further supplemented by uncontradicted evidence introduced on the trial," such that "[t]he conclusion to be drawn from the facts [was] essentially one of law."  *Id.* at 677.  The court determined that *Rutherford* was "squarely on point" and "controlling" and reversed the district court's legal determination that there was no employer-employee relationship, holding that such a relationship existed.  *Id.*

In *Goldberg v. Whitaker House Co-op., Inc.*, 366 U.S. 28 (1961), the Supreme Court held that the district court had wrongly concluded that certain "homeworkers" who "knitted, crocheted, and embroidered goods of all kind" were not employees because they were members of a cooperative, stating that "[t]here is no reason in logic why these members may not be employees."  *Id.* at 29, 32.  The facts had been found by the district

court, as the parties had stipulated at a pretrial conference "that the only issue for determination" was "whether or not the homeworkers, all of whom are members of the defendant Cooperative, are 'employees' of the defendants within the meaning of the Act," and therefore the district court heard evidence, invited briefs, and held oral argument on that issue before issuing its decision, which included lengthy factual findings. *Mitchell v. Whitaker House Co-op., Inc.*, 170 F. Supp. 743, 745 (D. Me. 1959). The Supreme Court did not reject any of the district court's factual findings but determined that the district court reached the wrong legal conclusion. 366 U.S. at 32.

In *Hodgson v. Ellis Transp. Co.*, 456 F.2d 937 (9th Cir. 1972), similar to the approach taken in *Rutherford* and *Goldberg*, the Ninth Circuit summarized the facts without discussing whether they had been disputed and how the factual findings were made. The court noted that "[s]ome aspects" of the working relationship "tend[ed] to indicate" that the worker was not an employee of the entity in question, while "[o]ther facts'" made the worker "look like" the entity's employee. *Id.* at 939. Nevertheless, the Ninth Circuit examined "the circumstances of the whole activity" and considered the "underlying economic realities" and had "no difficulty in deciding that the district court correctly classified [the worker] as [the entity's] employee." *Id.* at 940.

Several years later, the Ninth Circuit decided *Real*, which appears to be the only published Ninth Circuit opinion reversing a grant of summary judgment on the issue of joint employment and remanding due to "genuine issues of fact." 603 F.2d at 755. In *Real*, the district court determined that no employment relationship existed between the workers and the entities in question, but the Ninth Circuit stated that the "record as developed at this stage of the litigation undercut[]" that conclusion and that "[t]he appellants' affidavits, which must be taken as true for summary judgment purposes, plainly disclose that [the putative employer] possesses substantial control over important aspects of the appellants' work." *Id.* However, the Ninth Circuit never identified any specific facts that were genuinely in dispute. Nor did the Ninth Circuit appear to have trouble making inferences and drawing conclusions as to the relevant factors. *See, e.g., id.* at 756 ("Inferences drawn

- 12 -

from the record suggest that DSA effectively, though indirectly, controls certain important decisions in growing the strawberries, including the spacing of the plants, when and how much fertilizer is to be applied, and the timing and type of spraying for insects."). Nevertheless, the court concluded that "[a]t the very least, the record demonstrates the existence of genuine factual issues concerning whether Driscoll is an 'employer' of the appellants, within the meaning of the FLSA." *Id.* at 755.

*Real*'s approach does not appear to have gained traction in subsequent Ninth Circuit decisions.  Two years after *Real*, the Ninth Circuit decided *Donovan v. Sureway Cleaners*, 656 F.2d 1368 (9th Cir. 1981), which summarized the facts without indicating how they had been found, similar to pre-*Real* opinions.  The district court had, "after an extensive analysis of the facts," concluded that the workers were employees as defined by the FLSA, and the Ninth Circuit agreed.  *Id.* at 1370-71.

*Bonnette* was the next major Ninth Circuit decision regarding FLSA joint employment.  In *Bonnette*, the joint employment issue had been "tried and submitted to the [district] court upon the brief testimony of witnesses, exhibits and designated depositions." *Bonnette v. California Health & Welfare Agency*, 525 F. Supp. 128, 129 (N.D. Cal. 1981). The parties stipulated to certain facts, *id.* at 129-30, and the district court found additional facts, *id.* at 130-34.  The district court had previously "declined to resolve" the issue of joint employment at summary judgment, "preferring to await a fully developed factual record" and believing that "[t]he question of whether a party is an employer or joint employer for purposes of the [FLSA] is essentially one of fact." *Id.* at 134-35.  The district court resolved that purported question of fact following the bench trial, "find[ing] that the counties' involvement in and ultimate authority over the participation of chore workers in the IHSS program brings them within the definition of joint employer for purposes of the FLSA." *Id.* at 135-36.

The Ninth Circuit ultimately affirmed the district court's conclusion as to the joint employment issue but clarified that the determination raised a question of law, not a question of fact.  *Bonnette*, 704 F.2d at 1469.  The appellees, presumably hoping for a

deferential standard of review, argued that *Real* established that "the 'employer' determination is a finding of fact." *Id.* The Ninth Circuit disagreed and explained that "[r]ead in context," it was clear that the "genuine factual issues" in *Real* were "subsidiary factual questions and not the ultimate question of whether the defendant was an 'employer.'" *Id.* The Ninth Circuit noted that "[i]n FLSA cases, although it has not explicitly discussed the standard of review, the Supreme Court appears to treat the ultimate question of whether a party is an 'employer' as a legal issue." *Id.* The Ninth Circuit also noted that the Fifth Circuit and Eighth Circuit "treat[] this determination as a legal one." *Id.* Agreeing with its sister circuits, the court held that "[a]lthough the underlying facts are reviewed under the clearly erroneous standard, the legal effect of those facts—whether appellants are employers within the meaning of the FLSA—is a question of law" and that "[t]he reasons for deferring to the district court's determinations of fact do not apply in this case to the legal conclusion the court draws from those facts." *Id.*

Two years after *Bonnette*, the Supreme Court resolved an FLSA case in which the district court had entered findings of fact following an evidentiary hearing,[10] noting that the district court's factual findings were "certainly not clearly erroneous" and that "a factual question resolved against petitioners" below was "barred from review" "absent the most exceptional circumstances." *Tony & Susan Alamo Found. v. Sec'y of Lab.*, 471 U.S. 290, 299-301 (1985). Having deferred to the district court's findings of fact, the Supreme Court affirmed its conclusion of law that an employment relationship under the FLSA existed. *Id.* at 306.

Finally, in its more recent published decisions, the Ninth Circuit has routinely decided the question of joint employment without any mention of whether the underlying facts were genuinely disputed. *Torres-Lopez*, 111 F.3d at 639, 644 (noting that "whether an entity is a 'joint employer' under the FLSA . . . is a question of law" and "conclud[ing] as a matter of law" that an entity was a joint employer, reversing the district court's

---

[10] *Donovan v. Tony & Susan Alamo Found.*, 567 F. Supp. 556, 559 (W.D. Ark. 1982) ("Following an evidentiary hearing, the Court enters the following findings of fact and conclusions of law . . . .").

conclusion to the contrary); *Moreau*, 356 F.3d at 944 (affirming "an adverse summary judgment concluding Air France was not a joint employer" under the FMLA in a "necessarily fact-specific appeal"); *Ray v. Los Angeles Cnty. Dep't of Pub. Soc. Servs.*, 52 F.4th 843, 851 (9th Cir. 2022) (reversing district court's determination that entities were not joint employers and concluding they were).  The only exception the Court has found is *Lasater v. DirecTV, LLC*, 772 F. App'x 582 (9th Cir. 2019), in which the Ninth Circuit held in an unpublished decision that it was error to resolve a joint employment question "as a matter of law" at summary judgment where "[a] reasonable jury could find" that the joint employment inquiry could come out the other way.  *Id.* at 584-84.

The lesson to be distilled from these authorities is that it is sometimes appropriate to resolve the issue of joint employment at summary judgment even though the relevant factors may cut in both directions.  *See, e.g.*, *Senne v. Kansas City Royals Baseball Corp.*, 591 F. Supp. 3d 453, 511 (N.D. Cal. 2022) ("The question of whether an entity is a joint employer is fact-intensive, but whether an entity is a 'joint employer' under the FLSA is a question of law.  Summary judgment on the joint employer question may be proper even when some factors favor joint employment and others do not.") (cleaned up); *Zhao v. Bebe Stores, Inc.*, 247 F. Supp. 2d 1154, 1155 (C.D. Cal. 2003) (acknowledging that "[t]he joint employer determination requires a fact intensive inquiry," denying the plaintiff's motion for partial summary judgment, and resolving the question of law in favor of the non-movant); *Sanchez-Calderon v. Moorhouse Farms*, 995 F. Supp. 1098, 1107 (D. Or. 1997) (finding a joint employment relationship where the parties filed cross-motions for summary judgment).

However, it is also sometimes necessary to decline to resolve the issue of joint employment at summary judgment due to the presence of material factual disputes concerning the relevant factors.  *See, e.g.*, *Arredondo v. Delano Farms Co.*, 922 F. Supp. 2d 1071, 1087 (E.D. Cal. 2013) ("Delano Farms brought a motion for summary judgment, arguing that it did not employ plaintiffs under either federal or California law, but the motion was denied. . . .   The court ordered that the issue of whether Delano Farms

employed plaintiffs should be tried separately by bench trial.  The bench trial began on January 15, 2013 and ended on January 30, 2013."); *Jimenez v. Servicios Agricolas Mex, Inc.*, 742 F. Supp. 2d 1078, 1088-89 (D. Ariz. 2010) (acknowledging that "[w]hether an entity is a joint employer under FLSA and AWPA is a question of law" before concluding that "Defendants have presented evidence sufficient to create an issue of fact as to whether SAMCO exercised sufficient control and influence over SAMI to be considered a joint employer" and "[g]iven Defendants' evidence, the totality of the circumstances require denial of summary judgment regarding whether SAMCO was a joint employer"); *Chao v. Westside Drywall, Inc.*, 709 F. Supp. 2d 1037, 1063 (D. Or. 2010) ("Based on the analysis of the economic reality factors, the court concludes that there is sufficient evidence for a reasonable jury to find that Defendants[] were joint employers.").

Given this backdrop, the path forward here is to begin by evaluating the relevant *Bonnette* and *Torres-Lopez* factors.  When doing so, the parties' proffered evidence must be construed in the light most favorable to Plaintiffs, because they are the non-movants. That analysis is set forth in Part V below.  Once that evaluation is complete, the Court then must decide whether the relevant factors, as determined during the first step of the analysis, compel the legal conclusion that Spencer's was not Plaintiffs' joint employer.[11]   That analysis is set forth in Part VI below.

V.   Analysis Of The *Bonnette* And *Torres-Lopez* Factors

A.   **The Power To Hire And Fire**

The first *Bonnette* factor is the power to hire and fire workers.  704 F.2d at 1470.

Spencer's asserts that it "plays no role" in hiring the installation workers (Doc. 45 at 9) and Plaintiffs do not contest this assertion.

As for the power to fire, Spencer's argues that it "did not and does not play any part in the termination of an" installation worker but adds that it "can request" that an intermediary company not assign a particular installation worker "to perform delivery and

---

[11]   Plaintiffs have not filed a cross-motion to resolve the joint employment issue in their favor.  Accordingly, the analysis here is limited to the issue presented by the parties— whether Spencer's is entitled to summary judgment.

installation services for Spencer's customers." (Doc. 45 at 9; Doc. 45-1 at 4 ¶ 15.)[12] Spencer's also emphasizes that it "did not and does not require [intermediary companies or installation workers] to work exclusively for Spencer's." (Doc. 45 at 9; Doc. 45-1 at 4 ¶ 13.) In response, Plaintiffs argue that Spencer's possessed the indirect power to terminate KB Wallworx employees via its "authority to drop job counts, eliminate jobs, or deny certain Installers work." (Doc. 51 at 8-9.)

The firing-power analysis presents a close call. As an initial matter, although the Ninth Circuit initially described the first *Bonnette* factor as "whether the alleged employer . . . had the power to hire and fire the employees," *Bonnette*, 704 F.2d at 1470, subsequent Ninth Circuit decisions include the modifier "directly or indirectly" when describing this power. *Torres-May*, 111 F.3d at 640 ("The right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers."). Those decisions also suggest that it is error to disregard the manner in which a putative joint employer may indirectly exercise power over the employees of an intermediary company. *Torres-May*, 111 F.3d at 642-63 ("The record reveals that Bear Creek Farms in fact exercised significant control over the farmworkers' working conditions . . . [including] the power to decide which days were suitable for harvesting . . . . The district court did not attribute much significance to the above facts because it concluded that any control exercised by Bear Creek Farms was exercised indirectly. The regulations expressly state, however, that indirect control as well as direct control can demonstrate a joint employment relationship."). Thus, Spencer's is wrong to suggest that the analysis turns solely on whether it possessed the express power to terminate installation workers employed by KB Wallworx—indirect power may also suffice. Many district courts in the Ninth Circuit have emphasized this point. *See, e.g.*, *Carrillo v. Schneider Logistics Trans-Loading & Distribution, Inc.*, 2014 WL 183965, *4-5 (C.D. Cal. 2014) ("SLTD argues that its authority to request that Premier and Impact employees be removed from the warehouses is not equivalent to the authority to fire those

---

[12] Attached to Spencer's motion is the affidavit of its operations manager, Steve Hopper (Doc. 45-1 ¶ 1), which provides the foundation for most of the factual assertions in the motion.

employees. . . .  The Court is unpersuaded by the reasoning in [district court decisions applying such a rule].  The Ninth Circuit stated in *Torres-Lopez* that the right, directly or indirectly, to hire or fire workers weighs in favor of a finding of joint employment.  Here, the evidence of SLTD's authority to remove employees from the Mira Loma warehouses, combined with the evidence that this removal resulted in termination on several occasions, is sufficient to create a genuine dispute of material fact as to whether SLTD had the power to indirectly fire employees at the warehouses.") (cleaned up).  Some of the out-of-circuit decisions cited by Spencer's also acknowledge this point.  *Jacobson v. Comcast Corp.*, 740 F. Supp. 2d 683, 689-90 (D. Md. 2010) ("Comcast unquestionably plays a role in hiring and firing technicians.  It . . . reserves to itself the power to 'deauthorize' technicians who install its equipment.  Under the deauthorization process if Comcast receives information that a technician is performing installation work that does not meet standards set by Comcast, Comcast may advise the Installation Company that the technician no longer is authorized to perform installation work on behalf of Comcast.  Because the Installation Companies have virtually no positions for a technician to fill other than performing installation work for Comcast, deauthorization in effect constitutes 'firing.'").

To be clear, a putative joint employer's power to preclude particular employees of an intermediary company from performing services for it does not, alone, qualify as indirect firing power over such employees.  Instead, the existence of indirect firing power turns on additional facts, including the extent to which the intermediary company has other clients.  After all, if an intermediary company supplies workers to many different clients, a decree by one of those clients that a particular worker is unwelcome would not inexorably cause the intermediary company to terminate that worker—it could simply assign the worker to jobs associated with other clients.  *See, e.g., Johnson v. Serenity Transportation, Inc.*, 2017 WL 1365112, *6 (N.D. Cal. 2017) (noting that "[a]n alleged joint employer's right to remove workers from a jobsite may be tantamount to the right to fire *where the alleged joint employer's jobs constitute all or the vast majority of the contractor's work*" but concluding that this principle was inapplicable because "while SCI may be one of

Serenity's largest customers, . . . between 2012 and 2016 SCI removals accounted for between 8.6 and 13.8% of Serenity's total gross revenue" and thus "a Serenity removal technician's removal from SCI's rotation is not tantamount to termination from Serenity; such removal technician would still be able to respond to 85% of Serenity's calls and the vast majority of its revenue-generating calls") (emphasis added).  In contrast, if the putative joint employer supplies the "vast majority" of the intermediary company's work, the ability to bar particular employees of the intermediary company from performing work is more likely to qualify as indirect firing power.  *See, e.g., Perez*, 2015 WL 34541268 at *5-6 (emphasizing that the intermediary company's "near singular reliance on revenue from DirecTV is a significant consideration when analyzing the economic reality test factors" and concluding that the first *Bonnette* factor favored a finding of joint employment because "without DirecTV-generated and authorized work orders, an Installer had no work and therefore no pay" and "[i]n effect, DirecTV could constructively discharge an Installer by refusing to give him or her work"); *Lemus v. Timberland Apartments, L.L.C.*, 2011 WL 7069078, *10 (D. Or. 2011) ("[A] general right to remove JC Builders' employees from the job site . . . [is] a sanction somewhat equivalent to firing here where Polygon's jobs constituted the vast majority of JC Builders' work.  Thus, this factor weighs in favor of finding a joint employment relationship.").

Here, it is undisputed that Spencer's could require KB Wallworx to prevent particular KB Wallworx workers from performing installation services for Spencer's. Additionally, Plaintiffs have submitted evidence from which a reasonable factfinder could conclude that installation jobs for Spencer's constituted the vast majority of KB Wallworx's work.  (Doc. 51-2 ¶¶ 2, 32, 41 [Plaintiff Castillo's declaration, avowing that during his three-year term of employment at KB Wallworx, he "performed very few deliveries or installations for entities other than Spencer's" and "estimate[s] that more than 99% of all deliveries and installations that [he] completed were for and on behalf of Spencer's"].)  Thus, at least when all genuine disputes of material fact are resolved in Plaintiffs' favor, these pieces of evidence suggest that Spencer's possessed the indirect

power to fire WB Wallworx employees.

Spencer's arguments to the contrary are unavailing. According to Spencer's, a putative joint employer can possess the right to preclude a particular employee of an intermediary company from working on its jobs without possessing indirect firing power as long as there is no contractual "exclusivity provision" requiring the intermediary company to work exclusively for the putative joint employer. (Doc. 52 at 2-3, 5.) In support of this contention, Spencer's cites an array of district court decisions from outside the Ninth Circuit. But because those cases are not precedential and do not apply Ninth Circuit law (which, as discussed in earlier portions of this order, adopts a broad conception of joint employment), they are of limited assistance here. *See also Ray*, 52 F.4th at 848 ("[T]he concept of joint employment should be defined expansively under the FLSA . . . .") (citation omitted). As noted, the Ninth Circuit requires district courts to consider the economic reality of the relationship. The economic reality here, in light of the evidence that Spencer's supplies 99% of KB Wallworx's work, is that a KB Wallworx installation worker who can't work for Spencer's also can't work for KB Wallworx. *Cf. Andersen v. DirecTV Inc.*, 2017 WL 3382158, *5 (D. Ariz. 2017) (even though putative joint employer did not directly control the hiring and firing decisions of the intermediary company that supplied satellite installation technicians, the "Hire and Fire" factor did not support the putative joint employer's motion for summary judgment in light of the evidence that it could effectively "fire [installation technicians] by rerouting work from a technician or ceasing to send work orders to technicians").

The economic reality of Spencer's indirect firing power over KB Wallworx installation workers also distinguishes this case from *Moreau* and *Maddock*. In *Moreau*, the putative joint employer (Air France) did not supply all of the intermediary companies' work—one intermediary company (Dynair/Swissport) "did not service Air France exclusively," another intermediary company (Ogden/SkyChefs) experienced "no change in the number of employees . . . after Air France stopped using its catering services," and a third intermediary company (Aeroground) "serviced a number of carriers" and only

assigned "a small fraction of [its] employees" to Air France.  356 F.3d at 948-49.  *See also id.* at 953 (noting that "Dynair's need to service other customers . . . reflects an 'economic reality' that Dynair and its employees were not economically dependent on Air France").  Given those circumstances, it is unsurprising the Ninth Circuit concluded that "Air France lacked the ability to hire or fire ground handling company employees," *id.* at 950, but the economic reality is far different here.  Meanwhile, in *Maddock*, the district court did not analyze the first *Bonnette* factor in any detail because the plaintiff conceded it favored the defendant.  631 F. Supp. 2d at 1234 ("Plaintiff does not dispute that the first factor has not been met.").  Plaintiffs have made no such concession here.

Another factor that some courts in the Ninth Circuit consider when assessing indirect firing power is whether the putative joint employer has actually requested that a particular employee be restricted from its jobs and whether the intermediary company has responded by terminating that employee.  *See, e.g.*, *Adams v. US Airways, Inc.*, 2013 WL 1345509, *3 (D. Ariz. 2013) (declining to find joint employment, even though the intermediary company had no other clients and the putative joint employer had a contractual right to bar particular employees of the intermediary company from its worksite, because there was no evidence that the intermediary company had ever terminated an employee following a request by the putative joint employer to stop assigning that employee to its jobs: "The record does not demonstrate that this power was ever exercised."); *Carrillo*, 2014 WL 183965 at *4-5 (concluding that first *Bonnette* factor favored plaintiff because "the evidence of SLTD's authority to remove employees from the Mira Loma warehouses, *combined with the evidence that this removal resulted in termination on several occasions*, is sufficient to create a genuine dispute of material fact as to whether SLTD had the power to indirectly fire employees at the warehouses") (emphasis added).  However, not all courts within the Ninth Circuit find this consideration relevant or persuasive.  *See, e.g., Canh Le v. DirecTV, LLC*, 2017 WL 6939087, *5-6 (C.D. Cal. 2017) (finding that the "undisputed facts indicate that DirectTV . . . had indirect power to hire and fire Installers" because "DirectTV could constructively discharge an Installer

by refusing to give him or her work," even though there was "no evidence that DirectTV specifically requested or directed the Contracting Companies to . . . fire any . . . employee.").

Turning to the record here, although Plaintiffs present evidence that Spencer's once threatened to reduce the amount of work it was soliciting from KB Wallworx due to dissatisfaction with the work of a particular KB Wallworx driver (Doc. 49-10 at 2), it does not appear that Spencer's sought to bar that unspecified driver from performing future installation services.  Nor is it clear whether Spencer's followed through on the threat expressed in the email or whether the unspecified driver was terminated as a result of the threat.  Thus, at least on this record, Spencer's possessed indirect firing power that was not employed in practice.

Given this backdrop, where it is undisputed that Spencer's lacked the power (direct or indirect) to hire, there is evidence that Spencer's possessed at least indirect firing power, and there is no evidence that Spencer's exercised that indirect firing power in practice, the first *Bonnette* factor does not cut conclusively for or against a finding of joint employment. *Cf. Edmonds v. Amazon.com, Inc.*, 2020 WL 1875533, *4 (W.D. Wash. 2020) ("Because Mr. Edmonds alleges facts sufficient to infer that Amazon has the [indirect] power to fire, but not to hire, drivers, this factor is either neutral or weighs in favor of finding that Amazon is a joint employer.").[13]

### B.   Supervision And Control Of Work Schedules And Conditions

The second *Bonnette* factor is "whether the alleged employer . . . supervised and controlled employee work schedules or conditions of employment."  704 F.2d at 1470.

…

…

---

[13]   During oral argument, Spencer's contended that the first *Bonnette* factor should be resolved in its favor because the analysis can be broken into percentages: the absence of hiring power means "50 percent" of the factor cuts in its favor, and of the remaining 50% for firing power, the indirect power to hire is 25% and exercise of that power is the other 25%, such that 75% of the first *Bonnette* factor favors Spencer's.  The Court respectfully disagrees—the analysis cannot be reduced to such a mathematical exercise.

1.     <u>Work Schedules</u>

Spencer's asserts that it "played and plays no part in the decision by [KB] Wallworx and the [installation workers] regarding the number of trucks and [installation workers] assigned to deliver and install the products sold by Spencer's to its customers, or in the assignment of Mr. Castillo, Mr. Humm or any [installation worker] to any particular delivery or installation and/or the number of hours worked by any [installation worker]" and that its "only involvement in scheduling the delivery and installation of its products is coordinating the selection of the delivery and installation day with Spencer's customers." (Doc. 45 at 10; Doc. 45-1 at 4-5 ¶¶ 23-24.) Spencer's adds that it requires the installation workers "to perform delivery and installation between 7:00 a.m. and 5:00-6:00 p.m., unless Spencer's customers made . . . alternate requests and arrangements" with Spencer's. (Doc. 45 at 11; Doc. 45-1 at 5 ¶ 26.)

Plaintiffs respond that "Spencer's controlled where, when, and how [installation workers] performed their work." (Doc. 51 at 9.) In his declaration, Plaintiff Castillo explains that Spencer's set the installation workers' arrival time and required the installation workers to spend time working at the Spencer's warehouse before beginning their deliveries:

> When Spencer's used the Tempe warehouse, I was required to arrive at 5:00 a.m. to complete specific tasks in preparation for that day's deliveries and installations. During peak or busy times, Installers were required to arrive as early as 4:30 a.m. because that warehouse had a limited number of loading docks for all of the Installers to use. When Spencer's relocated to its new warehouse in Chandler, we were initially required to arrive at 5:00 a.m., but that arrival time changed to as late as 6:00 a.m. or 7:00 a.m. depending on work demands because there was additional loading capacity. I was directly told by Steve Hopper [Spencer's Operations Manager] the times when I was expected to arrive in the morning to complete Installer tasks. Typical Installer tasks upon arrival included disposing of boxes and packaging from the prior day's deliveries. We also unloaded customer's used appliances that we had replaced. . . . We then loaded the appliances for that day's deliveries in reverse order of delivery so that the last item loaded is the first item delivered.
>
> […]
>
> Spencer's also instructed that Installers needed to be on the road to deliveries no later than 8:00 a.m. I received repeated commands from Spencer's warehouse staff that I needed to hurry up and get on my way. For example, on April 21, 2021, I received a text message from Steve Hopper that states:

1   "Get loaded and out, you're already late no smoke breaks."

2   (Doc. 51-2 ¶¶ 21-24, 29.)

3   According to Plaintiffs, Spencer's also purchased software programs ("Dispatch

4   Track" from 2018 to November 2020, "Package.AI" from November 2020 to the present)

5   and required all installation workers "to use an electronic tablet or phone device that is

6   connected to the delivery software application." (Doc. 51 at 3.) Castillo also provides the

7   following description of the process by which installation workers' schedules and routes

8   are set:

9
10   When a Spencer's customer purchases an appliance and also purchases delivery and installation services, Spencer's schedules directly with the customer the date and time when the delivery and installation is expected to
11   occur. Each night, Spencer's would send to K.B. Wallworx or similar contractors a batch of the next day's delivery items and installation
12   schedules. K.B. Wallworx or similar contractors then distribute those deliveries and installations among their Installers to balance the total work
13   load. The Package.AI system can optimize the individual routes based on time parameters set by Spencer's and the customer, the total number of jobs,
14   and the number of available Installers. For example, if K.B. Wallworx had four available Installers, it may receive a batch of sixteen deliveries and
15   installations for the next day. K.B. Wallworx would confirm that there are four available Installers and Package.AI is able to automatically generate
16   four optimized routes of four deliveries each, that align with the schedules coordinated between Spencer's and the customer.

17   (Doc. 51-2 ¶¶ 10-12.)

18   According to Castillo, installation workers access the delivery software application

19   throughout the day, because it provides the delivery schedules and customer information.

20   (*Id.* ¶ 13.) Castillo describes how he would "transmit" via the delivery software application

21   "pictures of completed installation for proof of completion" and "customer signatures for

22   receipt of the appliances." (*Id.*) Castillo contends he "could not do [his] work" "[w]ithout

23   Spencer's delivery software application." (*Id.*) The delivery software application also

24   allows Spencer's to monitor whether each installation was completed on schedule. (*Id.*

25   ¶ 18.) Additionally, the application is capable of tracking installation workers' GPS

26   locations and transmitting that information to Spencer's. (*Id.*)[14] If installation workers fall

27

28   ───────────────
    [14]   Spencer's does not dispute the factual accuracy of this assertion but emphasizes that it "does not request or require the [installation workers] to share their GPS location" and

- 24 -

"behind schedule," they are "threatened with discipline" by warehouse employees of Spencer's and told to move faster. (*Id.* ¶ 19, 27.) Castillo states that "Spencer's employees, including Steve Hopper, called me directly on multiple occasions to tell me I was too far behind schedule and pressured me to work faster and skip breaks." (*Id.* ¶ 19.) Castillo states that "Spencer's pressured Installers to expedite their deliveries" to the point that Castillo was "aware of other Installers who would not stop to use a restroom because of the pressure to complete deliveries and installations faster" and was also "aware that some Installers resorted to urinating in water bottles because [they] were not allowed to use customer restrooms and public restrooms were not readily available." (*Id.* ¶ 27.) Plaintiffs' evidence includes a text message from Hopper to Castillo, sent on December 31, 2021 at 8:06 a.m., that reads: "Get loaded and out, you're already late no smoke breaks." (Doc. 51-4 at 2.) Castillo also states that he occasionally "tried to coordinate with [a] customer to reschedule," and when Spencer's learned he had tried to do so, "Hopper became angry with [him] and threatened [him] with discipline." (Doc. 51-2 ¶ 15.)[15]

The tentative ruling issued before oral argument concluded that the "work schedules" subfactor favored Plaintiffs. Upon reflection, and with the benefit of Spencer's presentation during oral argument, the Court concludes that this subfactor is not that helpful in resolving the joint-employment inquiry but, to the extent it is relevant, it tends to favor Spencer's.

As summarized above, the creation of installation workers' schedules begins via a combination of (1) decisions by Spencer's in scheduling the deliveries with its customers and (2) the algorithms used by Spencer's delivery software. Each intermediary company then informs Spencer's how many installation workers are available on a given day. Spencer's then assigns a certain number of jobs to each intermediary company based on the number of installation workers available, and then Spencer's software generates a set of routes and schedules, at which point the intermediary companies divvy up those

asserts that "[a]bout half" of them choose to share it. (Doc. 45 at 11.)

[15]     In reply, Spencer's does not dispute any of these facts.

schedules among the available installation workers.

Even though, as noted in the tentative ruling, some courts have concluded that the "work schedules" subfactor cuts in favor of a finding of joint employment in these circumstances,[16] that conclusion is difficult to reconcile with *Moreau*.  There, the Ninth Circuit analyzed whether an airline should be considered the joint employer (for FMLA purposes) of the employees of the intermediary companies with whom it contracted for ground handling, catering, and cargo handling services.  Among other thing, the Ninth Circuit concluded that the "work schedules" subfactor cut against a finding of joint employment, even though airline necessarily dictated when and where the intermediary companies' employees would be working on a given day, because the intermediary companies were ultimately responsible for choosing which employees to assign to perform those services each day: "Air France did, of course, schedule its flight into and out of SFO, which necessarily indicated when the services were to be performed.  The individual companies, however, remained responsible for designating which employees would report to service the aircraft."  356 F.3d at 950 n.5.  *See also id.* at 949 (emphasizing that the intermediary company "had discretion . . . in scheduling [its] employees and could transfer them from one client account to another, so long as the appropriate minimum number of employees were assigned to service Air France").

The same is true here.  Although Spencer's effectively dictates the length and timing of each shift, KB Wallworx chooses which of its employees will work each shift.  Under *Moreau*, that sort of dynamic seems to cut against characterizing Spencer's as the installation workers' joint employer.  With that said, this case differs from *Moreau* in that Spencer's also effectively dictates the granular details of what each shift entails, down to

---

[16]     *See, e.g., Edmonds*, 2020 WL 1875533 at *5 (concluding that "[t]his factor weighs in favor of joint employment" where the plaintiff alleged, *inter alia*, "that Amazon requires packages to be delivered to Amazon customers 'according to an exact schedule that dictates the order of delivery and provides the exact route to utilize'"); *Hall v. DIRECTV, LLC*, 846 F.3d 757, 762 (4th Cir. 2017) (concluding that, "[r]egardless of the identity of Plaintiffs' nominal employers, DIRECTV primarily directed and controlled Plaintiffs' work" in part because "DIRECTV, through its provider agreements, required technicians to receive their work assignments through a centralized system operated by DIRECTV").

1  the route each installation worker is required to follow over the course of the shift.  But in

2  the Court's estimation, that consideration is better addressed as part of the "working

3  conditions" analysis below, not as part of the "work schedule" analysis as conceptualized

4  in *Moreau*.

5            **2.**    <u>Working Conditions</u>

6            Also relevant is the degree to which Spencer's supervised the installation workers

7  or controlled their working conditions.  *Bonnette*, 704 F.2d at 1470.  Spencer's asserts that

8  it "never provided any [installation worker] with a uniform or any clothing bearing

9  Spencer's name or logo or branding" and does not require installation workers to "submit

10  to any drug testing." (Doc. 45 at 12.)

11            These considerations may, in isolation, cut against a finding of joint employment.

12  *Felder v. U.S. Tennis Ass'n*, 27 F.4th 834, 846 (2d Cir. 2022) ("Felder also did not allege

13  that the USTA would have been involved in . . . controlling other means of his employment

14  (such as providing his uniform or other tools needed for the position).  Absent these types

15  of factual allegations, we simply have no basis to conclude that the USTA would have been

16  Felder's joint employer.").  However, they are not dispositive, and Plaintiffs have

17  submitted evidence that certain other working conditions were controlled by Spencer's.

18            As noted, Plaintiffs have submitted evidence that the installation workers felt so

19  much pressure to work faster and skip breaks that they needed to urinate in water bottles.

20  Plaintiffs' evidence supports the conclusion that Spencer's, not KB Wallworx, created and

21  maintained that working condition.  Spencer's delivery software apparently does not factor

22  in sufficient time for installation workers to take restroom breaks, as "pressure to complete

23  deliveries and installations faster" led installation workers to "resort[] to urinating in water

24  bottles."[17]  (Doc 51-2 ¶ 27.)

25            The presence of this Spencer's-controlled working condition also serves as another

26  basis for distinguishing this case from *Moreau* and *Maddock*.  In *Moreau*, the Ninth Circuit

27

28

---

[17]    Hopper testified that "pee bottles in our trash area" are "a common occurrence" because "inevitably, the drivers or installers maybe don't want to stop to use a restroom, they'll pee in a water bottle, and they'll throw it in their trash boxes."  (Doc. 51-1 at 14.)

explained that a putative joint employer's "indirect supervision or control" over the activities of the intermediary company's employees "can, in some situations, constitute 'indirect' supervision of the employees' performance" but concluded that this factor still favored the airline because "much of the indirect supervision or control exercised by Air France over the ground handling employees was purportedly to ensure compliance with various safety and security regulations . . . .  Any airline that is concerned about its passengers' safety would be remiss to simply delegate a task to another party and not double-check to verify that the task was done properly." 356 F.3d at 950-51.  But requiring installation workers to forego bathroom breaks is not tantamount to ensuring compliance with safety regulations.  Instead, it is a way to maximize profit.  Similarly, in *Maddock*, the district court acknowledged that a finding of joint employment may "rest[], in part, on the showing that the [putative joint employer] determined the plaintiffs' work duties or how the plaintiffs were to do their jobs from day-to-day" but concluded that the plaintiff had "not adduced" sufficient evidence on this point because the putative joint employer merely "conveyed training materials, procedures, and other information to management personnel in [the intermediary companies], and . . . these personnel would sometimes pass along this information to sales agents such as plaintiff.  Plaintiff has made no showing that the subsidiaries were required by [the putative joint employer] to pass these materials along to their sales agents." 631 F. Supp. 2d at 1236-37.  Here, in contrast, the evidence is that KB Wallworx required its installation workers to download and follow the Spencer's software app.

Plaintiffs' evidence also shows that Spencer's has, at times, directly contacted installation workers to threaten them with discipline for not staying on schedule.[18]  This,

_____

[18]    In its motion, Spencer's asserts that it did not directly contact installation workers regarding late deliveries or customer complaints: "For example, if the [installation worker] is outside of their estimated time of arrival of which they previously notified the Spencer's customer, or if Spencer's receives a complaint from one of Spencer's customers, Spencer's would contact the [intermediary company], and not the [installation worker].  (Doc. 45 at 12.)  However, the only cited support for this assertion is the Hopper declaration.  (Doc. 45-1 at 7 ¶ 41.)  Meanwhile, in their response brief, Plaintiffs contend that Spencer's did, in fact, directly contact installation workers to complain about their work and attach evidence to support this contention, including text messages in which a Spencer's representative directly contacted installation workers to voice complaints about being

too, distinguishes this case from *Moreau* and *Maddock* and cuts against Spencer's position as to the second *Bonnette* factor.  *Compare Edmonds*, 2020 WL 1875533 at *5 (second *Bonnette* factor supported plaintiff in part because the putative joint employer "supervises the work of each driver on a daily basis") *with Moreau*, 356 F.3d at 950-51 ("There is no indication that Air France had the authority to directly 'control' any of the workers, but would instead communicate any complaints about performance to the service company's supervisors.") *and Maddock*, 631 F. Supp. 2d at 1237 ("Plaintiff has produced no evidence to refute KB Home's assertions that KBLA, not KB Home, supervised and determined the duties of their sales agents in accordance with the salesperson employment agreements signed by plaintiff.").

Accordingly, on this record, the second *Bonnette* factor does not cut conclusively for or against a finding of joint employment.  *Cf. Moreau*, 356 F.3d at 951 ("[E]ven if Air France's actions in specifying the work to be performed and following up to ensure adequate performance do constitute some control over the work or working conditions of the employee, the regulations do not say that a joint employment relationship is necessarily formed . . . .") (cleaned up).

## C.     Control Over The Rate And Method Of Payment

The third *Bonnette* factor is whether Spencer's "determined the rate and method of payment."  704 F.2d at 1470.

Spencer's asserts that it "does not determine the rate of pay of, nor make any payments to" the installation workers, that it instead "makes all payments directly to" the intermediary companies, and that it receives no record of how much the installation workers earn.  (Doc. 45 at 13; Doc. 45-1 at 3-4 ¶¶ 17-18.)  Spencer's contends that it pays the intermediary companies "a fixed rate determined by the type of appliance or product

---

"late" and to raise other work-related concerns.  (Docs. 51-3, 51-4.)  In its reply, Spencer's does not address this issue.  Given this backdrop, it is unclear whether Spencer's has abandoned the position it staked out in its motion (and even if not, whether Hopper's conclusory assertion on this point, which is contradicted by the text messages Plaintiffs produced, is entitled to any evidentiary weight).  Nevertheless, even assuming the point remains disputed, Plaintiffs have, at a minimum, raised a genuine dispute of fact on this point that must be resolved in their favor as the non-movants.

that is delivered and installed." (Doc. 45 at 13; Doc. 45-1 at 4 ¶ 19.)

Plaintiffs respond that because Spencer's pays the intermediary companies "based upon a fixed pricing schedule . . . set by Spencer's" and installation workers are "then paid a fixed percentage of what was paid to [the intermediary company]," it follows logically that "if Spencer's adjusted its rates, [the installation workers] would make more or make less based on that adjustment." (Doc. 51 at 10-11.)

Plaintiffs' argument is unavailing because it rests on an unfounded assumption—that if Spencer's increased the amount it paid to KB Wallworx for each installation, the percentage of that sum that KB Wallworx paid its installation workers (Doc. 51-2 ¶ 35 [calculating this percentage as 50% to 65%]) would remain constant, such that the increase would benefit the installation workers. What Plaintiffs overlook is that nothing in this hypothetical scenario would prevent KB Wallworx from choosing to reduce the percentage, such that the installation workers' pay would remain the same (and the surplus would be retained by KB Wallworx as additional profits).[19]

Furthermore, the third *Bonnette* factor would become a one-way ratchet in favor of liability if construed in the broad manner suggested by Plaintiffs, as it is difficult to imagine a vertical structure where the putative joint employer's payments to an intermediary company would not have *some* effect on what the intermediary company pays its workers. The Court thus agrees with the district courts that have rejected variants of Plaintiffs' argument on this point:

> Plaintiffs have provided no evidence indicating that Comcast tells the Installation Companies how to pay its employees. Instead, Plaintiffs claim Comcast has control over their wages simply because Comcast pays the Installation Companies on a per service basis, and the Installation Companies pay technicians on a per services basis. To find that this arrangement places Comcast in control of Plaintiffs' wages would dramatically expand the FLSA to subsume traditional independent contractor relationships. An employee's

---

[19] *Real* is not to the contrary. Although the Ninth Circuit inferred from the facts of that case that "it appear[ed] that DSA," which was the higher entity in a possible vertical joint employment endeavor, "may ultimately determine the amount the [workers] are paid for their labor," 603 F.2d at 756, this was in the context of a contractual agreement between the two purported joint employers (drafted by DSA without negotiation or significant input from the intermediary company) that established how the workers would be paid. *Id.* at 752. Spencer's had no comparable involvement here.

> income, received from its direct employer, will always be determined and influenced by what a contractor decides to pay the direct employer for services rendered by the employee. The Installation Companies, not Comcast, determine whether to pay their employees on a per service or salary basis, and at what rate. Plaintiffs have produced no evidence indicating Comcast's authority over these decisions.

*Jacobson*, 740 F. Supp. 2d at 692 (cleaned up). *See also Zampos v. W & E Commc'ns, Inc.*, 970 F. Supp. 2d 794, 804 (N.D. Ill. 2013) ("Plaintiffs argue that Comcast plays a significant role in determining how much W & E technicians are paid simply because it pays W & E on a per service basis, itemizes how long work tasks should take, and associates point value and hourly rates for each job. The Court rejects this argument. 'An employee's income, received from its direct employer, will always be determined and influenced by what a contractor decides to pay the direct employer for services rendered by the employee.'") (citation omitted). This conclusion is also consistent with *Moreau*. 356 F.3d at 948-51 (concluding that the putative joint employer "did not determine the rate or method of pay for [the intermediary companies'] employees" and did not "establish conditions upon which the employees would receive payment" where one intermediary company "was paid primarily based on the amount of cargo it handled, and not for specific employee time" and other intermediary company generally "charged Air France based on the type of aircraft involved," although the airline "was subject to additional charges for [intermediary company] employees' time" when flights were delayed).

However, Plaintiffs' evidence related to the third *Bonnette* factor is not limited to the issue addressed in the above-cited cases (*i.e.*, indirect control over the intermediary company employees' gross pay). Separate from that issue, Plaintiffs have submitted uncontroverted evidence that Spencer's possesses (and has exercised) the power to *reduce* installation workers' pay in two different ways: (1) by "instruct[ing] Ken Bruning," the president of KB Wallworx, "to make a deduction" from that worker's pay; and (2) by instructing Bruning to indirectly reduce that worker's pay by means of "reduced routes and fines" as a punishment if the worker "failed to meet performance expectations." (Doc. 51-2 ¶¶ 26, 30; Doc. 51-7 ¶ 13; Doc. 51-8 ¶ 13.) Such conduct is not "typical of any client/independent contractor relationship" because it involves the putative joint employer

directly "tell[ing] the Installation Company how to pay its employees."  *Jacobson*, 740 F. Supp. 2d at 692.  Nor is there any indication that the putative joint employers in *Moreau* and *Maddock* engaged in such conduct.

Accordingly, the third *Bonnette* factor presents a mixed bag in some ways but ultimately can be viewed as supporting Plaintiffs' position.  Although Spencer's does not set the installation workers' pay rates or directly pay them, it still "exercise[s] some power" as to what the installation workers are paid—which, in turn, "point[s] to a conclusion that [the installation workers] were employees of [Spencer's] for purposes of the FLSA." *Torres-Lopez*, 111 F.3d at 643.

### D.    **Maintenance Of Employment Records**

The final *Bonnette* factor is whether Spencer's "maintained employment records." 704 F.2d at 1470.

Spencer's asserts that it does not "maintain any personal information regarding [the installation workers], such as a mailing address, email address, social security number or any other personal identification information, other than a cell number for each which Spencer's maintains for use as necessary to address unexpected changes or last minute cancellations by Spencer's customers."  (Doc. 45 at 14.)

Plaintiffs respond that Spencer's had access to stored records, retained by its delivery software, with a "time-stamped record of job completion times" and the number of "completed jobs" which was necessary for "billing."  (Doc. 51 at 11-12.)  Additionally, Plaintiffs assert that Spencer's "collected and retained records regarding [installation workers'] performance and discipline."  (*Id.* at 12.)

In reply, Spencer's acknowledges that "[w]hat constitutes 'employment records' is not specifically identified by case law" and argues that "[t]he type of records maintained by Spencer's via its Package.AI program are not employment records, but rather business records . . . ."  (Doc. 52 at 9-10.)

An initial difficulty posed by the fourth *Bonnette* factor is that the Ninth Circuit has never defined what "employment records" means in this context.  Some district courts have

narrowly construed this term as "includ[ing] an employee's personnel files, time sheets, pay stubs, and government employment forms." *Hugee v. SJC Grp., Inc.*, 2013 WL 4399226, *7 (S.D.N.Y. 2013). Others disagree, concluding that the term "sweeps more broadly" and also includes "documents related to the workers' job assignments and transfers and records of past infractions or discipline." *Senne*, 591 F. Supp. 3d at 527.

The Court is persuaded by the decisions that have narrowly construed this term as encompassing only the sorts of documents that are part-and-parcel of the traditional employment relationship, such as personnel files, time sheets, pay stubs, and government employment forms (such as a Form I-9).[20] There is no evidence that Spencer's maintains such records in relation to the installation workers. Additionally, even though it might be possible to calculate, from the records created and stored via the Spencer's app, the number of hours a particular KB Wallworx installation worker spent working on Spencer's installations, there is no evidence that Spencer's intended for the application to be used for that purpose (or, in fact, used it for that purpose). Courts have concluded that the "employment records" factor cuts against a finding of joint employment in such

---

[20]     The Court reaches this conclusion because the contrary approach would mean that the fourth *Bonnette* factor is almost always satisfied—presumably, a company that hires an intermediary company to provide services will always maintain *some* records that contain information that touches, directly or indirectly, on the identity of the employees of the intermediary company or the amount and quality of work they perform. A factor that always favors liability is not a meaningful factor. This conclusion is also consistent with *Moreau*. There, the Ninth Circuit concluded that "Air France . . . did not keep employment records for these employees," 356 F.3d at 950, even though other portions of the opinion imply that Air France possessed various documents that touched on the training, hours, and job performance of the intermediary companies' employees. *See, e.g., id.* at 950 ("Air France provided some training to Aeroground employees on the Air France computer system and other training to ensure compliance with applicable safety regulations in the United States and France, if the employees had not already received such training."); *id.* at 951 ("Air France was . . . very specific about how it wanted its work performed, and it checked to ensure that its standards were met and that the service provider's overall performance adhered to Air France's specifications. . . . [M]uch of the indirect supervision or control exercised by Air France over the ground handling employees was purportedly to ensure compliance with various safety and security regulations, such as ensuring that food equipment was properly stowed or that the plane's load was adequately balanced."); *id.* at 952-53 ("Dynair charged Air France a flat rate based on the type of aircraft serviced; there was also a one-hour grace period. If service was required beyond the one-hour grace period, Air France was subject to extra charges based on the number of employees Dynair held over and what Dynair had to pay the employees to keep them waiting around for the Air France aircraft.").

circumstances. *See, e.g., Franco v. Roman's Commercial Cleaning & Property Maintenance, Inc.*, 2018 WL 2447790, *5 (D.R.I. 2018) ("The record makes clear that Roman's maintained no employment records, such as personnel files, time sheets, pay stubs, or government employment forms, for the individual Plaintiffs.  The only records Roman's maintained, albeit on a temporary basis, were quality-of-work reports, customer complaints to Roman's about the quality of Eagle's cleaning and the tardiness or absence of employees, and the automatically generated emails from the call-in, timekeeping service at Stop & Shop stores that recorded Eagle employees' absences and time spent at the stores. These records merely demonstrate that Roman's maintained records for quality-control purposes—a type of recordkeeping that does not suffice to show that Roman's controlled Plaintiffs' employment.") (cleaned up).[21]

Accordingly, the fourth *Bonnette* factor cuts against a finding of joint employment.

---

[21]    *See also Jean-Louis v. Metro. Cable Comm'ns, Inc.*, 838 F. Supp. 2d 111, 130-31 (S.D.N.Y. 2011) ("It is undisputed that Time Warner does not maintain personnel files for individual employees, time sheets, pay stubs, or government employment forms. . . .  Time Warner does receive from Metro lists of Metro technicians and their technician numbers— numbers which also appear on work orders that Metro technicians submit after completing installation jobs.  Further, the fact that Time Warner compiles quality control data on individual technicians suggests that Time Warner is in possession of raw data regarding how many jobs—as opposed to hours—an individual technician has completed.  Moreover, through its automated systems, Time Warner is aware of when a technician has started and completed a given job.  Hence, in theory, Time Warner could make assumptions as to an installer's travel time and roughly calculate how many hours an individual technician has worked each day.  But there is no evidence that Time Warner does so.  Nor is there any evidence that Time Warner maintains records designed to track how many jobs an individual technician completes. . . .  Hence this is not a case where a putative joint employer 'signs off on' time sheets completed by each plaintiff, verifies the number of hours worked by each plaintiff and then provides records of the hours worked to the plaintiff's contractor employer who uses the records to compensate the plaintiff on a per-hour basis.  Rather, this is a case where Time Warner maintains data that might be used to determine how much a plaintiff worked as a byproduct of calculating how often that plaintiff performed his work well.") (cleaned up); *Jacobson*, 740 F. Supp. 2d at 692 ("Plaintiffs also contend that Comcast's record retention is indicative of Joint Employment. Comcast does maintain some records, including (1) arrival and departure data for each cable technician, (2) lists of cable technicians and their employment status, reasons underlying any terminations, and information on the vehicles they drive, and (3) drug testing and criminal background information on all cable technicians.  While the retention of these records might on the surface seem to evidence an employment relationship, upon closer scrutiny the retention of the records is only an extension of Comcast's control procedures. . . .  Plaintiffs have presented no evidence to indicate that the maintenance of this type of information is used to control a technician's day to day employment, or that Comcast retains records for any purpose beyond quality control.") (citations omitted).

- 34 -

E.    **Specialty Job On The Production Line/Integral Part Of Business**

The first *Torres-Lopez* factor is whether the work was "a specialty job on the production line." 111 F.3d at 640 (cleaned up). This language is taken from *Rutherford*, a case that involved an actual production line. Separately, the eighth *Torres-Lopez* factor is "whether the service rendered is an integral part of the alleged employer's business." 111 F.3d at 640 (cleaned up).

Spencer's does not directly address any of the *Torres-Lopez* factors in its summary judgment motion, although it includes the following passage at the outset of the motion:

> Spencer's primary business is retail sales of televisions and appliances, with most of its sales transacted at its retail store locations. Not surprisingly, a majority of customers do not have the knowledge, experience or resources to pick-up their purchases from Spencer's warehouse and install them themselves, such as transporting a refrigerator or washing machine in their Toyota Corolla, nor installing a new oven or cooktop or range hood. So delivery and installation are a part of Spencer's customer service.

(Doc. 45 at 3.)

In response, Plaintiffs argue that this passage operates as a concession that the first and eighth *Torrez-Lopez* factors are satisfied, because it shows that the delivery and installation services provided by installation workers are analogous to a "specialty job on the production line" and "are an integral part of its [Spencer's] business." (Doc. 51 at 14, 17.)

In reply, Spencer's does not directly address the first *Torres-Lopez* factor and argues that, under *Moreau*, the eighth factor is irrelevant outside the production-line context. (Doc. 52 at 11.)

The Court will begin with the eighth factor. The Hopper declaration expressly acknowledges that installation workers are "integral" to Spencer's business:

> The delivery and installation of Spencer's products for Spencer's customers is "integral" to Spencer's business because a large majority of customers do not have either the knowledge, experience or resources to pick-up [sic] their purchases from Spencer's warehouse and install them themselves.

(Doc. 45-1 at 3 ¶¶ 5-6.)[22] It follows that the eighth factor supports Plaintiffs' position.

---

[22]    The Hopper declaration also includes a comparison: "This delivery and installation process is 'integral' to the same extent as receiving inventory from the manufacturers to

1    The Court respectfully disagrees with Spencer's contention that, under *Moreau,* the

2    eighth *Torres-Lopez* factor is irrelevant in cases not involving production-line work.   In

3    *Moreau*, the court simply "question[ed]" whether the eighth factor "translates well outside

4    of the production line employment situation" before concluding that "even if" the varied

5    set of services at issue were "essential" to the putative joint employer, that sole factor did

6    "not outweigh the numerous significant factors [that weighed] heavily against finding a

7    joint employer relationship."  356 F.3d at 952.  This is not the same thing as a holding that

8    the eighth factor is always irrelevant outside the production-line context.  At any rate, under

9    Ninth Circuit law, this Court is bound by *Torres-Lopez*'s holding that the eighth factor may

10    be a relevant consideration in cases not involving production lines, even if subsequent

11    three-judge panels of the Ninth Circuit have questioned that holding.  *Lair v. Bullock*, 798

12    F.3d 736, 745 (9th Cir. 2015) (explaining that, absent an "intervening higher authority,"

13    "three-judge panels are normally bound by the decisions of prior three-judge panels")

14    (citing *Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003) (en banc)).

15    Finally, as for the first *Torres-Lopez* factor, the Ninth Circuit has suggested that it

16    simply overlaps with the eighth factor when, as here, the case does not involve actual

17    production-line work.  *Torrez-Lopez*, 111 F.3d at 643 (discussing how the work performed

18    in that case was "analogous to" a specialty job on the production line because the workers'

19    "only function was to pick cucumbers according to standard industry practice" and "[w]hat

20    they did constituted one small step in the sequence of steps taken by Bear Creek Farms to

21    _____

22    sell to customers is 'integral' to Spencer's business—without inventory, Spencer's would
have nothing to sell.  But I do not consider the workers in, for example, a Samsung
manufacturing plant to be employees of Spencer's."  (Doc. 45-1 at 3 ¶ 6.)  But Hopper's

23    opinion on this point does nothing to detract from his acknowledgement that the work of
the installation workers is integral to Spencer's.  Hopper's comparison also oversimplifies

24    the process a court must follow in considering all of the established facts, analyzing myriad
factors, and reaching a conclusion of law.  If Samsung's factory workers were suing

25    Spencer's under the FLSA and asserting that Spencer's was their joint employer, this one
factor might be resolved in their favor if the evidence showed that Spencer's considered

26    their work integral to its business—but success on this isolated factor would likely be
insufficient to establish a joint employment relationship if many other significant factors

27    suggested that such a relationship did not exist.  Indeed, this is the holding of *Moreau*—
the eight *Torres-Lopez* factor did "not outweigh the numerous significant factors [that

28    weighed] heavily against finding a joint employer relationship."  356 F.3d at 952.  Being
one factor in a multi-factor analysis is not the same thing as irrelevance.

1    grow the cucumbers and prepare them for processing at the cannery"). Thus, the first factor

2    either supports Plaintiffs' position for the same reasons as the eighth factor or is irrelevant.

3    ### F.    Standard Responsibilities Among Contractors

4    The second *Torres-Lopez* factor is "whether responsibility under the contracts

5    between a labor contractor and an employer pass from one labor contractor to another

6    without material changes."  111 F.3d at 640 (cleaned up).  This language is taken from

7    *Rutherford*.  There, in a case involving workers at a slaughterhouse, the Supreme Court

8    highlighted that even when the contractor who contracted with the slaughterhouse to

9    "assemble a group of skilled boners to do the boning at the slaughterhouse" abandoned his

10   contractor position and was replaced by a series of other contractors, 331 U.S. at 724-25,

11   "the *same* employees [continued] to do the *same* work in the *same* place." *Zheng v. Liberty*

12   *Apparel Co. Inc.*, 355 F.3d 61, 74 (2d Cir. 2003) (summarizing *Rutherford*).  "Under

13   *Rutherford,* therefore, this factor weighs in favor of a determination of joint employment

14   when employees are tied to an entity such as the slaughterhouse rather than to an ostensible

15   direct employer." *Id.*

16   Plaintiffs argue that the services they provided to Spencer's remained constant even

17   as they sometimes switched between intermediary companies:

18   > Spencer's consistently engaged 19 to 20 Contractors that did the same thing.
19   > While there were subtle differences in individual Installer skill sets, each
     > contractor employed installers who essentially delivered and installed
20   > appliances for Spencer's.  K.B. Wallworx typically had four or five installers,
     > who each similarly delivered and installed those appliances.  Mr. Castillo is
21   > aware of several Installers who changed between Contractors, but continued
     > delivering and installer for Spencer's.  This factor weighs in favor of a joint
22   > employer relationship because Installer work does not materially change
     > between Contractors.

23   (Doc. 51 at 14, citations omitted.)  Plaintiffs point to Castillo's declaration as evidence:

24   "During my work as an Installer for K.B. Wallworx and Spencer's, I became aware of

25   several Installers who changed the Contractors who they worked for without any

26   meaningful change in their duties.  They continued delivering and installing appliances for

27   Spencer's but for a different Contractor."  (Doc. 51-2 ¶ 40.)

28   Spencer's does not address this factor in its reply.

- 37 -

For the reasons stated by Plaintiffs and not disputed by Spencer's, the second *Torrez-Lopez* factor weighs in favor of concluding that Spencer's was a joint employer of the installation workers.  This also serves as another basis for distinguishing this case from *Moreau*.   There, the Ninth Circuit emphasized that the second *Torres-Lopez* factor "counsel[ed] against finding Air France to be a joint employer" because "[t]he service contracts were negotiated and quite specific; there is no indication they could simply be passed on to another contractor."  356 F.3d at 951.  Again, that is not the situation here, at least on this record.

### G.    Use Of The Employer's Premises And Equipment For Work

The third *Torres-Lopez* factor is "whether the premises and equipment of the employer are used for the work."  111 F.3d at 640 (cleaned up).

As to this factor, Plaintiffs argue:

> Spencer's warehouse is where Installers unload trash, pick up appliances, and receive training and direction.  The Package.AI software tool provides all of the essential information for the Installer's work.  Status, job completion, and records of the same are all contained within Package.AI.  This factor weighs in favor of joint employment because Spencer's premises and equipment are essential to completing Installer work.

(Doc. 51 at 15.)

In reply, Spencer's states that it does not provide uniforms or trucks.  (Doc. 52 at 10-11.)  Spencer's does not deny that it provides the Package.AI software and does not respond to Plaintiffs' argument that the software is essential to the installation workers' work.  Spencer's also asserts that the installation workers "only" come to the Spencer's warehouse "to pick up the appliances and products to deliver and install."  (*Id.*)  However, Spencer's cites no evidence for this proposition and Plaintiffs have submitted evidence that installation workers were required to (and did) spend substantial time at the Spencer's warehouse.   (Doc. 51-2 ¶¶ 21-24, 29 [Castillo declaration, avowing that installation workers were required to arrive to the Spencer's warehouse for loading and preparatory activities as early as 4:30 a.m. and work in the warehouse before their delivery schedule began].)

The tentative ruling issued before oral argument stated that the third *Torres-Lopez* factor cut, on balance, in favor of Plaintiffs.  With the benefit of Spencer's presentation during oral argument, the Court now concludes that it favors Spencer's.  In *Moreau*, even though the intermediary companies' employees had "some minimal (and obviously essential) contact with the Air France airplane during loading or cleaning, which usually consisted of only 30 to 45 minutes of work," the Ninth Circuit concluded that the third *Torres-Lopez* factor cut against a finding of joint employment because "[t]he service work was primarily performed on the premises of the ground handling companies or the airport tarmac" and "[t]he ground companies also invested significant capital in expensive equipment such as forklifts, kitchen equipment, and so forth. . . .  Although Air France provided some equipment, such as the food trays and baggage pallets, this equipment was minimal in comparison to the large kitchen equipment or heavy cargo loading equipment found on the ground."  356 F.3d at 951.  Those circumstances are similar to the facts of this case—although installation workers spend some time at the Spencer's warehouse, the majority of their time is spent on the road or in customers' homes, using trucks and heavy equipment supplied by WB Wallworx.  *Moreau* may not be on all-fours with this case due to the added consideration of the mandatory Spencer's software app, but the third *Torres-Lopez* factor still cuts, on balance, in favor of Spencer's.

## H.   Employee Business Organization That Could Shift As A Unit

The fourth *Torres-Lopez* factor is "whether the employees had a business organization that could or did shift as a unit from one worksite to another."  *Torres-Lopez*, 111 F.3d at 640 (cleaned up).  This language is again taken from *Rutherford*, in which the Supreme Court noted that the group of workers assembled by a contractor to work at a slaughterhouse "had no business organization that could or did shift as a unit from one slaughter-house to another."  331 U.S. at 730.  Similarly, in *Torres-Lopez*, the Ninth Circuit noted that the contractor "selected the farmworkers from the labor pool," hiring "individual" workers rather than enlisting them as an organized unit.  111 F.3d at 644.

In contrast, in *Moreau*, one group of employees (the "ground handling employees")

"*did* have a business organization that could and did shift as a unit from one carrier to another," as the "ground handling companies serviced multiple carriers" and "many of the individual employees worked for multiple carriers in a given work day." 356 F.3d at 951. Another group of employees (master chefs) "were even unionized." *Id.*  Notably, *Moreau* seemed to assume—at least as to the ground handling employees—that the "business organization" could be the intermediary company that directly hired individual employees, whereas in *Rutherford* and *Torres-Lopez* the courts seemed to focus on whether there was an organization or unit *separate from* the assemblage of workers hired by the intermediary company.

Here, there is no evidence that the installation workers have any sort of business organization separate from being hired by the same intermediary company.  Nor is there any indication that they could or did shift their work, together as a unit, away from Spencer's and to some other company in need of installation and delivery services.  To the extent the installation workers who work for the same intermediary company could be considered to "have a business organization"—to *have* one, not to *work for* one—the fact that KB Wallworx provides delivery services almost exclusively to Spencer's means the economic reality is that this "business organization" does not allow the installation employees to shift, as a unit, to servicing another entity.  That decision would have to be made by KB Wallworx, and there is no evidence that the installation workers have any power over the decisions of KB Wallworx.

Spencer's asserts in its reply that installation workers "can and did shift from one worksite to another."  (Doc. 52 at 11.)  However, the only cited support for that assertion is a cross-reference to page nine of the summary judgment motion, which states that "on more than one occasion, Mr. Castillo independently and directly contracted with a Spencer's customer to deliver and install Spencer's products for that customer without any payment by the customer to [KB] Wallworx or Spencer's for that service."  (Doc. 45 at 9.) Putting aside the fact that Castillo's independent work was apparently impermissible and subjected him to reporting (Doc. 51-16), the Court does not see how these isolated episodes

could demonstrate that the installation workers were part of a *business organization* that shifted *as a unit* from one worksite to another.

Accordingly, the fourth *Torres-Lopez* factor weighs in favor of concluding that Spencer's was a joint employer of the installation workers.

I. **Need For Initiative, Judgment, Foresight, Or Special Skill**

The fifth *Torres-Lopez* factor is "whether the work was piecework and not work that required initiative, judgment or foresight [or a special skill]." 111 F.3d at 640 (cleaned up). This factor again derives from *Rutherford*, where the Supreme Court noted that "[w]hile profits to the [workers] depended upon the efficiency of their work, it was more like piecework than an enterprise that actually depended for success upon the initiative, judgment or foresight of the typical independent contractor." 331 U.S. at 730.

The "special skill" part of this factor derives from *Real*, in which the workers were "strawberry growers" who were hired "to care for the land and plants during the growing season, to harvest the strawberry crop, and to sort, grade and pack the strawberries." 603 F.2d at 751. The workers' "duties in caring for the land and plants include[d] cultivating, irrigating, fumigating and fertilizing said land." *Id.* at 751 n.3. The workers' "own judgment determine[d] the timing of weeding, dusting for mildew, and irrigation." *Id.* at 752. Although the workers presumably needed sufficient knowledge of caring for strawberry crops to perform their duties, the Ninth Circuit stated that "[t]he services performed by the [workers] consist primarily of physical labor, requiring no special technical knowledge or skill." *Id.* at 755. Meanwhile, in *Moreau*, the Ninth Circuit explained that "[t]he skill level required of the workers varied widely depending on the job performed, and thus it is not clear that this factor cuts either way. Obviously, the position of master chef requires more skill than the position of a baggage handler, but even baggage handlers required some specialized training." 356 F.3d at 951-52.

Plaintiffs assert that the fifth *Torres-Lopez* factor supports their position because the work of installation workers was mostly "repetitive and labor intensive, not technical" and the required training was "not technical or complicated." (Doc. 51 at 16.) In support of

these assertions, Plaintiffs point to Castillo's declaration, which states as follows:

> I was trained on products manufactured by LG, GE, Sub Zero, and others that included ovens, refrigerators, dishwashers, ice makers, washing machines, dryers, and similar home appliances.  These trainings were scheduled by Spencer's and held at Spencer's warehouse or store location. . . .  These trainings were not difficult or overly technical.  Trainings usually consisted of verbal instruction, drawings or diagrams, and demonstrations on actual appliances.  We were shown how to configure and set up the appliances, ensure that they were in proper working order, and received a demonstration of appliance features.
>
> [ . . . ]
>
> Most of my work time as an Installer was spent driving to deliveries and the manual labor of loading and unloading appliances.  This work was repetitive and labor intensive.  It was not highly technical. . . .  Spencer's expressly prohibited other Installers and me from performing technical work like plumbing, electrical, or carpentry work.  As an Installer, I connected hoses and electrical lines.  I assembled parts provided by the appliance manufacturer.  More technical work was deferred to other professionals.

(Doc. 51-2 ¶¶ 6-7, 38-39.)

In reply, Spencer's contends that Plaintiffs' argument rests on the faulty presumption "that anyone can install a built-in oven, cooktop, range hood, gas dryer, water filtration system, or the other Spencer's products" and urges the Court to "take judicial notice that they can't."  (Doc. 52 at 11.)

With the benefit of oral argument, the Court concludes that the fifth *Torres-Lopez* factor is essentially neutral.  Even accepting that not everyone can perform appliance installation services—manual labor requires a degree of strength and physical agility that some lack—the work here required only minimal training.  Under somewhat analogous circumstances in *Moreau*, where "even baggage handlers required some specialized training," the Ninth Circuit concluded that "it is not clear that this factor cuts either way." 356 F.3d at 951-52.  So, too, here.[23]

---

[23]     The Court acknowledges that some courts have reached the opposite conclusion in cases involving dissimilar forms of installation work.  *Herman v. Mid-Atlantic Installation Servs., Inc.*, 164 F. Supp. 667, 675 (D. Md. 2000) ("While the Secretary has attempted to downplay the skill level required to install and service cable systems, there is no question that it is a skilled trade.  The skills involved in cable installation and service are akin to carpentry and electrical work.  Traditionally, carpenters, construction workers, electricians and similarly skilled tradesmen are considered independent contractors.  Because of the similarity between cable installation and these trades, this factor indicates a finding that the Installers are independent contractors.") (citations omitted).

J.      **Opportunity For Profit Or Loss Depending Upon Managerial Skill**

The sixth *Torres-Lopez* factor is whether the workers had an "opportunity for profit or loss depending upon their managerial skill." 111 F.3d at 644 (cleaned up).

Plaintiffs assert that "this factor also weighs in favor of a joint employer relationship because" installation workers "only receive a fixed percentage based on jobs completed," such that "opportunities to earn money [are] limited to the jobs completed." (Doc. 51 at 16.) Plaintiffs also submit evidence that the fixed rate is a set percentage of whatever Spencer's pays KB Wallworx for each completed job. (Doc. 51-2 ¶¶ 33-37.)

Spencer's does not address this factor in its reply.

On this relatively undeveloped record, the sixth *Torres-Lopez* factor weighs in favor of concluding that Spencer's was a joint employer of the installation workers. *Compare Torres-Lopez*, 111 F.3d at 644 (workers had no "opportunity for profit or loss depending upon their managerial skill" where they "worked at a piece-rate and the amount of money they earned depended solely upon the number of cucumbers they themselves picked") *with Moreau*, 356 F.3d at 952 ("[I]n contrast to the farm laborers [in *Real*], the ground company employees did have an opportunity for profit or promotion based on their managerial skill, and such promotions occurred within the ground handling companies, and not Air France.").

K.      **Permanence In The Working Relationship**

The seventh *Torres-Lopez* factor—and the last to be discussed in this analysis, as the eighth factor was addressed in subpart V.E *supra*—is "whether there was permanence in the working relationship." 111 F.3d at 640.

Plaintiffs assert that "[t]here is a strong degree of permanence weighing in favor of a joint employer relationship." (Doc. 51 at 17.) This assertion is supported by the deposition testimony of Hopper, who testified that some of the installation workers are "around a while" and that "they work for [Spencer's] as long as [Spencer's] has work available," which is "potentially indefinitely." (Doc. 51-1 at 10-11.) Hopper testified that he knew installation workers who worked for Spencer's for "maybe ten years." (*Id.* at 12.)

And as noted elsewhere in this order, Castillo avowed in his declaration that he is "aware of several Installers who changed the Contractors who they worked for without any meaningful change in their duties.  They continued delivering and installing appliances for Spencer's but for a different Contractor."  (Doc. 51-2 ¶ 40.)

Spencer's does not address this factor in its reply.

For the reasons stated by Plaintiffs and not disputed by Spencer's, the seventh *Torres-Lopez* factor either weighs in favor of concluding that Spencer's was a joint employer of the installation workers or is, at most, neutral.  *Moreau*, 356 F.3d at 952 ("The longevity of the working relationship varied from [intermediary] company to [intermediary] company and employee to employee.   It appears that the same chef worked on the Air France account for some time; the Aeroground warehouse employees, however, turned over rather frequently.  This factor does not weigh heavily in either direction.").

## VI.   Joint Employment

As noted, the ultimate question of "whether an entity is a 'joint employer' under the FLSA . . . is a question of law."  *Torres-Lopez*, 111 F.3d at 639.  In light of the conclusions reached in Part V above, Spencer's is not entitled to summary judgment on that issue.  Many of the *Bonnette* and *Torres-Lopez* factors point toward the existence of an employer-employee relationship between the installation workers and Spencer's, particularly when the evidence is construed in the light most favorable to Plaintiffs.

Accordingly,

**IT IS ORDERED** that Spencer's motion for summary judgment (Doc. 45) is **denied**.

Dated this 21st day of February, 2024.

Dominic W. Lanza
United States District Judge

- 44 -